# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 11, 2014

## STATE OF TENNESSEE v. TARRANTS CHANDLER

**Appeal from the Criminal Court for Davidson County**
**No. 2011A825      Mark J. Fishburn, Judge**

---

**No. M2013-00279-CCA-R3-CD - Filed July 7, 2014**

---

The defendant, Tarrants Chandler, was indicted by a grand jury for ten counts of rape by coercion, Class B felonies, and two counts of criminal exposure to HIV, Class C felonies. After a trial, the jury convicted the defendant of nine counts of rape by coercion and one count of criminal exposure to HIV. The trial court declared a mistrial as to Count 2, rape by coercion, and Count 12, criminal exposure to HIV. The conviction in Count 1 was dismissed by the trial court after the motion for a new trial. The defendant now appeals the remaining convictions, arguing that the evidence was not sufficient to find the defendant guilty of eight counts of rape by coercion, that the trial court erred by ruling that consent was not a defense to rape by coercion, that the trial court erred by failing to find prosecutorial misconduct based on aspects of the State's closing argument, and that the trial court erred by imposing an effective fifty-year sentence on the defendant. After a thorough review of the record, we affirm the judgments of the trial court but remand for: (1) entry of corrected judgments that reflect the dismissal of Count 1; and (2) to correct clerical errors in the judgments on both Count 6, because the judgment in Count 6 orders the sentence to be served concurrently with the sentence from Count 2, which was declared a mistrial, and the judgment in Count 8, which states that the sentence is to be served concurrently, rather than consecutively to the sentence in Count 11.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Joshua L. Brand, Nashville, Tennessee, for the appellant, Tarrants Chandler.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kristen Menke and Rob

McGuire, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

D.D.[1] is the mother of the victim, and she testified that she had known the defendant since 2004 when she met him in Michigan through a mutual friend. Shortly after they met, the defendant moved into D.D.'s home and assisted in caring for D.D.'s two daughters, the victim and her younger sister. After the defendant moved in with D.D., the two developed a sexual relationship, and the four began living as a family unit.

D.D. and the defendant later moved her family to Kentucky after receiving a job offer. The defendant subsequently returned to Nashville to care for his biological daughter but made multiple trips to visit D.D. and her daughters, where D.D. stated that they would resume the "[f]amily relationship and our relationship." In 2008, D.D.'s son offered her a job at DT's Used Appliances in Gallatin, and D.D. and her daughters, along with her friend Katherine Dalton and her two children, moved to Tennessee to accept the job.

The defendant moved into the apartment sometime in November of 2008 and resumed caring for D.D.'s children and taking them to school. During the time period between his move to Nashville and his move into the apartment, the defendant and D.D. were separated. Once they resumed their relationship, he functioned as "the other part" of D.D. in terms of his relationship with her daughters and was viewed as a father and a caretaker to the girls, a role that no one else had filled since Michigan. While D.D. was ultimately responsible for the discipline of her children, the defendant also disciplined the children but looked to D.D. for the more serious issues.

In 2009, D.D.'s relationships with both the defendant and the victim began to sour. D.D. noted that the defendant began to spend a great deal of time alone with the victim, frequently taking her places but not allowing D.D. or the other children to accompany them. D.D. noted that previously the defendant either went places by himself or took all of the children with him. The defendant and the victim would nightly sit in a car outside of the Gallatin Road apartment and listen to the radio for "about an hour, hour and a half." When D.D. would tell the victim to come back inside, the defendant would respond, "[o]h, she don't need to come inside, she's just fine out here. She's talking to her friend, we're just listening to music. I'm not a child molester. What are you accusing me of?" D.D. did not

---

[1] We will refer to the victim's mother by her initials in order to protect the privacy of the victim.

have the opportunity to spend much time alone with the victim because the defendant "wouldn't allow it." He frequently became hostile towards D.D. when she confronted them in the car, asking her why she was "policing" him. D.D. felt as though the defendant was usurping her role as a parent and was not acting as her boyfriend but rather he "was just being there, just helping out and being there and not even communicating anymore . . . we were like two separate entities." In front of the victim, the defendant frequently stated that D.D. was "policing" him and behaving like his parole officer and told D.D. to "[q]uit policing" the victim whenever D.D. attempted to speak individually with the victim.

D.D. suspected that the defendant and the victim smoked marijuana while sitting in the car. She knew that the defendant smoked marijuana in the car, and she admitted that she and Ms. Dalton smoked marijuana with the defendant "on occasion." The defendant remarked that the victim should smoke marijuana as well, claiming that her nerves were bad. D.D. never witnessed the victim smoking marijuana or heard from the defendant that the victim was smoking marijuana in the car, but she was suspicious because the victim smelled like marijuana after sitting in the car with the defendant.

D.D. recalled an instance that occurred sometime in July when the defendant and the other children had returned from a trip to a water park, and D.D. suspected that the victim had smoked a cigarette. She found a discarded cigarette behind the apartment that was still warm, and she confronted the victim about it. After the victim stated that she was not smoking, D.D. instructed the victim to give D.D. her hand so that she could put the warm cigarette on her hand. The victim then ran to the front of the store to the defendant, the defendant stepped between the two, and he told D.D. that she was not going to put the cigarette on the victim's hand. D.D. and the defendant proceeded to get into an argument. The defendant later grabbed D.D. by her neck and began choking her and threw her against a wall. The defendant demanded money, and D.D. gave him her car keys and $1200. He then stated that he was going to take the victim and hide her so that D.D. would not be able to find her. When she asked the victim why the defendant would want to hide her, the victim responded that it was because D.D. did not pay any attention to her. The defendant moved out of the apartment after this incident.

Shortly after the defendant had moved out, D.D. saw text messages on the victim's phone that D.D. knew came from the defendant. The defendant's contact information was stored in the victim's phone under the name "Yogotti," but D.D. recognized the number as one belonging to the defendant. The first text contained an apology for the argument and a promise to pay back the $1200. The next message stated that "they wouldn't understand because of our age difference and so we'll just have to wait until you get older before we can have a relationship because then they would understand." D.D. then sent that text message back to the defendant and to his mother, at which point the defendant telephoned her to ask

what she was doing. When she asked him about the message, the defendant replied that he "sent it to [his] girlfriend." When asked if the victim was his girlfriend, he responded that he was mistaken; the defendant claimed that his cousin, the victim's boyfriend, actually had his phone and had been the one to send the message. The defendant then telephoned D.D.'s son and threatened to kill him, but the defendant subsequently stated that he did not intend to follow through with his threat and was merely upset because D.D. confronted him about his text messages.

D.D. stated that this was the first time the defendant had threatened her son and the first time that he had told her that she "better put your black dress on." D.D. perceived this statement to mean that "death was upon my door" or that the defendant was threatening her life.

After the defendant moved out of the apartment, he still communicated with the victim via text message. D.D. recalled an instance when the victim told her that she wished to spend the night with a friend and that the friend's mother would come to pick her up in the parking lot. When D.D. told the victim that the mother needed to come into the store to pick the victim up, the victim ran out the back door of the apartment into an alley, and D.D. saw the defendant's car. She telephoned the defendant and told him not to pick up the victim, and the defendant responded that it could not have been his car because he was in Madison. The victim denied that the defendant was there to pick her up, but D.D. became suspicious when she overheard the victim on the phone apologizing that "she saw your car."

D.D. stated that when the defendant and the victim were alone together, the victim answered the defendant's phone when D.D. called. The defendant answered the victim's phone two to three times a week, and the victim answered the defendant's phone "plenty of times" when it rang. The defendant told D.D. that she was depressed and going through menopause and as a result was being "overly emotional" and "too clingy" with the victim. He further told D.D. that these changes were affecting the way she viewed the relationship between the defendant and the victim.

In August of 2009, D.D. and her children moved into a new residence on Sarver Avenue. D.D. was still in contact with the defendant after he moved out of the Gallatin Road apartment because he still wished to see her daughters. She stated that the defendant was not supposed to be in contact with her children but that he contacted them through the victim's phone. D.D. finally allowed the defendant to see her daughters near the end of September under the conditions that the visits occur in public places and only between the hours of 12:00 p.m. and 4:00 p.m. on Sundays. The defendant was alone with the children during these visits. She and the defendant began to slowly rekindle their relationship in October, and by November, the defendant was spending several nights a week at the Sarver Avenue

house.

One night in December 2009, D.D. saw a text message in the victim's phone that was sent by "Yogotti" and was from the same number that she previously recognized as belonging to the defendant. The text message said, "I don't know why you want him when you can have big daddy [sic] like me and I'll rub cocoa butter all over your body and I'll wipe it all off." D.D. asked the victim what the text message meant, and the victim told her that they were discussing the defendant's biological daughter. When the defendant returned to the Sarver Avenue house that evening, D.D. told him that she wanted him to leave the residence, and she began to pack his things. Ultimately, she permitted the defendant to remain at the Sarver Avenue house. She did so because she was confused about "the arguing and bickering" and because the victim was saying that nothing was going on between her and the defendant. She stated that she "loved and trusted this man as being a mentor to my children and helping me" but could not get anyone to confess what was going on. The defendant and victim made D.D. feel as though she were a "police officer, a probation officer" and that she was "the crazy one because I can't chill out and I can't have fun and I don't understand this new age."

On December 19, 2009, the defendant was arrested and went to jail. While he was incarcerated, D.D. continued her attempts to reconcile with the defendant. She corresponded with him in jail, writing him letters that discussed working on their relationship, and she took her children to visit him in jail. She also sent the defendant pictures of herself and the entire family that chronicled their lives together since residing in Michigan. At this point, D.D. did not believe that there was a sexual relationship between the victim and the defendant and believed the claims of the victim and the defendant that there was nothing sexual about the text messages that she discovered.

The defendant moved back into the Sarver Avenue residence in February after he was released from jail. Once he returned, "he resumed the role of co-parenting[,]" and his relationship with the victim changed because he was co-parenting with D.D. Prior to his return, D.D. had informed the defendant that if he did return, he would do so as a co-parent with her and would not be permitted to go places alone with the victim. He agreed to these changes but abided by them for only two to three weeks before "it started all over again . . . his attitude changed, his demeanor, [the victim's] demeanor."

Ultimately, the defendant moved out of the Sarver Avenue residence. D.D. and the defendant had a disagreement after he wanted to visit his mother's house alone with the victim, a condition to which D.D. would not agree. They agreed that their relationship was over, and D.D. informed her daughters that her relationship with the defendant had ended. The defendant took the victim to the school bus the next day and then telephoned D.D. and

told her that while their relationship was over, his relationship with her daughters was not over. He returned to the Sarver Avenue residence very upset and began destroying items in the house; he flipped over a table, broke D.D.'s telephone, and smashed the venetian shades, a chair, and a table. He refused to leave the house, but he permitted D.D. to go to work. D.D. believed that the defendant would move his belongings out of the house while she was at work, but when she returned home unannounced around 5:00 p.m., she witnessed the defendant and the victim in the house "laughing, giggling, playing." The defendant and D.D. then began to argue about a vehicle he claimed that she purchased for him, and he told the children they needed to get outside because "you don't want to see what's about to happen to your mother."

D.D. pleaded with her daughters not to leave her and ran upstairs to be with her daughters. The defendant then pushed D.D. down the staircase and proceeded to strike her head against the ground, stopping only when D.D.'s youngest daughter began hitting the defendant with a baton. At that point, the defendant exited the residence.

The next day, D.D. visited her primary care physician and had a large bump on her head and bruises all over her back. She also took out an order of protection for herself and her children against the defendant. She took out the order for her children because she did not want the defendant to use her "kids to be able to get back in the home" and did not want the defendant to contact the victim.

Several months after the defendant was served with an order of protection, D.D. discovered that the victim was having sexual intercourse with her boyfriend. D.D. believed that her daughter "felt too comfortable to have sex" and suspected that this comfort level was due to her relationship with the defendant. Whenever D.D. previously asked the victim about her relationship with the defendant, the victim was "on the defensive or . . . on attack[,]" and D.D. said that she utilized a different approach with this particular conversation to "use it as a learning experience to [the victim] and just talk to her through it." The victim then revealed to D.D. that she had a sexual relationship with the defendant.

D.D. took the victim to the police station where she filed a report, had the victim examined by a physician, and enrolled the victim in counseling. The victim was interviewed by Detective Jill Weaver of the Metro Police Department and later participated in a forensic interview at the Center of Nashville Children's Alliance. The police interviewed D.D. as well, and D.D. learned several months later that the defendant was HIV positive. D.D. was tested for HIV, and the test was negative. She testified that the defendant never informed her that he was HIV positive, never purchased medication to treat HIV, nor did she witness the defendant take medication to treat HIV. She testified that she and the defendant did not use condoms when they had sexual intercourse, but in her statement to police she told a detective

that she did use condoms with the defendant. She discovered condoms in the Gallatin Road store in the fall of 2009 in the victim's pencil bag; when she confronted the victim and defendant about the condoms, each said they belonged to the other.

After reporting the abuse to the police, D.D. began to look for items in her house that indicated a sexual relationship between the victim and the defendant. The victim showed D.D. thong underwear that the defendant had purchased for the victim and a bottle of douche that the defendant had given to the victim. She testified that she and the victim were slowly repairing their relationship and that she did not know everything that transpired between the victim and the defendant.

The victim testified that she was sixteen years old at the time of trial and that she was nine years old when she first met the defendant. She stated that they initially did not get along very well and used to "pick on" each other. However, when the family moved to Kentucky, she started to view the defendant as a stepfather because they were getting to know each other better, and he drove her to and from school and assisted her with her homework. Once the defendant moved into the Gallatin Road apartment, she again began to view him as a stepfather, but their relationship began to change as they grew closer and began to have more in common. She often accompanied the defendant when he left, going "everywhere" with him.

She first used drugs with the defendant in December of 2008. She was dating the defendant's cousin at the time, and she went to the park with the defendant and his cousin. The defendant and his cousin were smoking marijuana in the park, and the victim initially declined when they offered her the drug, but she later agreed after the two told her she should try it. After the incident in the park, she began regularly smoking marijuana with the defendant when the two sat in the car and listened to music. In the car, they "were just listening to music and just hanging out and just chilling, talking back about forth, telling how our days went and how we are doing." The victim became comfortable with the defendant and their nighttime routine, and she started to view the defendant as a boyfriend and believed that he wanted her to be his girlfriend. Whenever D.D. came out to the car and attempted to speak with the victim, the defendant would "speak for" the victim, telling D.D. that the victim was fine and would come back into the store in a little while, and then he would roll her window up. She initially thought it was unusual that the defendant spoke for her in these instances, but they later had conversations where the defendant intimated that he did not want D.D. to know what was going on between the two of them.

The defendant did not have a very close relationship with the victim's younger sister. It annoyed the defendant when the younger sister would "tell" on the victim in situations where the defendant and the victim were smoking marijuana together. The defendant

stopped taking the younger sister with him after she told D.D. that the victim was smoking marijuana with the defendant, and he did not take any of the victim's friends places because "he did not want other people to realize and pick up of [sic] what was going on at the time." The defendant told the victim that once she turned eighteen years old they would live "a perfect life together" and that she was going to be the mother of his little boy and stepmother to his daughter.

The relationship between the victim and the defendant started to change in January of 2009, when the victim was fourteen years old. One night while the two were in the car listening to music, the defendant started to rub the victim's legs but did not do anything further. The victim stated that, at the time, she did not care because she was high. The defendant also provided the victim with ecstacy, alcohol, and Black and Mild cigarettes at various points in time. Several days after this first incident, the victim was lying on her mother's bed after smoking marijuana with the defendant; he was rubbing her legs and then "went down into" the victim's pants, pulled them off, and began performing oral sex on her. In her initial statement, the victim wrote that the first incident occurred in mid-May of 2009. She told the forensic interviewer that the first sexual encounter with the defendant happened in June and told a detective that the first encounter occurred in July. At trial, the victim testified that it occurred in January of 2009 at the Gallatin Road apartment and that this instance of oral sex was the first sexual act that the defendant performed.

The next instance of sexual activity that the victim recalled occurred at the Gallatin Road apartment. They built a pallet on the floor for the victim's younger sister and the defendant's daughter to sleep on. The defendant lay between the two girls on the floor, and the victim was on the couch. D.D. was in her bed asleep. Once everyone fell asleep, the defendant began rubbing the victim's legs, and she "knew that was a sign that he was fixin [sic] to do something." The defendant then performed oral sex on the victim and had sexual intercourse with her. She estimated that the intercourse lasted about thirty to forty-five minutes and stated that the defendant used a condom, which the victim assumed he later threw away. The victim testified that she remembered that the defendant "sometimes" used condoms and admitted to telling the detective that she did not know if the defendant used condoms. The State elected this incident as the offense for Counts 1 and 2 of the indictment.

The victim testified that after the defendant moved out of the Gallatin Road apartment, there was an incident where she went with the defendant to his mother's house, and, while the defendant's biological daughter was upstairs, he remained downstairs smoking marijuana and watching television with the victim. Once the victim became sleepy, the defendant started pulling down her pants, performed oral sex on her, and then had sexual intercourse with her. The State elected this incident as the offenses in Counts 7 and 8 of the indictment. She told the defendant that she did not wish to have sex with him but said that "it was like

talking to a wall." Whenever the victim was on her back and attempting to push the defendant's weight off of her body and he got tired of her pushing, he would flip her onto her stomach and have sex with her from the back. She recalled multiple instances where the defendant had sexual intercourse with her from the back, but he never inserted his penis into her rectum.

There was some confusion as to when the first instance of sexual intercourse occurred. The victim testified that she first had sexual intercourse with the defendant at his mother's residence and that this happened in the summer of 2009. She then testified that the defendant first had sexual intercourse with her in January of 2009. She recalled that it was cold outside when the defendant first had sex with her.

The victim testified that the defendant sent her a text message one night at the Gallatin Road apartment asking her to meet him in the kitchen. Everyone else, including D.D., was asleep in the apartment. When the victim arrived in the kitchen, the defendant had her stand on the kitchen table, where he then removed the victim's pants and performed oral sex on her for about fifteen minutes. The State elected this incident as the offense for Count 3 of the indictment.

The victim recalled a separate incident on the pallet where the defendant performed oral sex on her and inserted his fingers into both her vagina and her rectum. The State elected this incident as the offenses in Counts 4-6 of the indictment. The victim testified that this was the only instance where the defendant inserted anything into her rectum but that he sometimes inserted his fingers into her vagina while performing oral sex. She initially stated in her forensic interview that the defendant did not place anything in her rectum and testified at trial that she made this statement because at the time she "did not remember."

The victim recalled another incident at the Gallatin Road apartment where she awoke without any clothes on and noticed that her bra was on the floor and her underwear was stuck in the couch. The victim had no memory of what occurred but surmised that the defendant either engaged in oral sex or sexual intercourse with her. She suspected that the defendant had most likely given her drugs the night the incident occurred. She stated that she always used drugs when they had sexual intercourse.

The victim stated that Sundays were always "[their] days" to have either oral sex or sexual intercourse. She recalled having sexual intercourse or oral sex four times on Sundays at the Gallatin Road apartment through the months of March and April. She estimated that she and the defendant engaged in sexual activity "roughly three times out of the week" and that the majority of the time the defendant performed oral sex on her. She admitted that in her initial statement, she wrote that the defendant had sex with her twice a week. She

testified that she remembered having oral sex with the defendant in the past before giving her initial written statement but admitted that she did not mention the oral sex in her written statement. She testified that she only remembered the oral sex after re-reading the letters the defendant sent her while he was in jail. She stated that she told the detective that she did not remember the oral sex because she was afraid that D.D. would hear her and, even though she had already told D.D. about the oral sex, she was afraid because there "was always a conflict . . . whenever [the victim] was talking to [D.D.] about the situation."

As her relationship with the defendant progressed, the victim's relationship with D.D. deteriorated. They had "no type of connection" and "no contact" with each other. She recalled the defendant calling D.D. a "probation officer" and preventing the victim from speaking with D.D. on the telephone when she called.

After the defendant moved out of the apartment, he continued to see the victim. She saved his contact information in her phone under the name "Yogotee," and she attempted to sneak out of the apartment to see the defendant. The defendant was the primary initiator and planner of these meetings, and the victim "just fell along with it because I missed him and I wanted what he had." She felt sad when the defendant was out of the apartment and felt her "life was ending" because she no longer received the attention and drugs that he provided her. She felt addicted and wanted more. She had never received the kind of attention that the defendant offered her, and she believed him when he told her about the perfect life they would live together once she turned eighteen years old.

 Once the victim moved into the Sarver Avenue house, she recalled having sexual intercourse with the defendant in her room, her mother's room, and in the den area. She stated that they had oral sex in her room, her mother's room, the den area, on the floor, in the living room, on the couch, and on the floor of the living room. She specifically recalled an instance where she had consumed ecstacy and alcohol, and after taking a "share shower" with the defendant, he performed oral sex on her in the den. The State elected this incident of oral sex as the offense in Count 9 of the indictment. In her written statement, the victim wrote that D.D. believed that the defendant had crushed up a pill and placed it in her drink, and she admitted that she told the detective that she believed that the defendant was putting ecstacy pills into her drink. She testified at trial that she did not have any reason to suspect that the defendant was putting pills into her drink.

She also testified that the victim performed oral sex on her in her bedroom at the Sarver Avenue house on the day that the defendant was arrested. She testified that the defendant came up the stairs "real quick," performed oral sex on her, and then returned downstairs. The State elected this incident as the offense in Count 10 of the indictment.

The defendant had a variety of nicknames for the victim, calling her "his precious little girl[,] . . . Baby Berry, Little A, A-money, A, Baby Boo[,] . . . red bone." He also used the acronym "FSM" to refer to the victim, which she testified stood for "Future Son's Mother." The defendant also referred to her vagina as "Chicken." The victim and the defendant used the term "Becky" to describe oral sex. The defendant introduced the victim to the term, which came from a rap song that the defendant played for the victim. She first heard this term in the summer of 2009. They never verbally spoke of the term but used it in text messages, where the defendant would ask "'[a]re you ready for Becky', or '[d]id you like Becky? Would you like some more Becky.'"

After the defendant was arrested, he sent the victim two letters from jail. In the first letter, the defendant wrote that he missed smoking with the victim and discussing life, and he encouraged her to keep up her grades because any poor grades in school would be attributed to her smoking marijuana. He also told the victim to be respectful to her mother and honor her wishes and to be protective of her younger sister. He asked the victim if she missed "Becky," and he wrote that he missed "chicken like a mutha [sic] um um I can't wait." In a second letter, the defendant again encouraged the victim to listen to him "on certain stuff like helping and respecting your mama and not turning on yo [sic] sister." He complimented the victim on her grades and told her that he could not wait to "run one and bump da [sic] radio" with the victim. He also wrote that he could not wait for the victim to "hook [the defendant] up wit [sic] some pics [sic]" and called the victim "babi berry." He wrote that "I wana [sic] eat some chicken bad ass hell u know dats my s**t [sic]." He did not think the victim would miss him as much as he missed her, but he wrote that he was wrong and that the victim "must really love daddy huh? . . . I love u 2 baby boo and F.S.M.!"

The victim agreed that she was upset when the defendant was arrested because it meant an end to the drugs and sex that the defendant provided. She testified that she wrote the defendant two letters while he was in jail and confirmed that it would not surprise her to hear that she actually wrote the defendant three letters. She recalled telling the detective that she did not remember if she responded to the defendant's letters and recalled stating that she might have written the defendant one time. She admitted that this statement to the detective was not entirely accurate.

The defendant never asked the victim to do anything sexually to him, and she never did anything to him. She never kissed the defendant because she "found it very disgusting," and she did not look at him when he performed oral sex or sexual intercourse. She "always felt it was very weird, but while I was on these drugs and while he was performing on me, it felt very good." The victim felt it was "weird" to kiss the defendant because while she looked at the defendant as a boyfriend, she had also seen the defendant kiss her mother. The victim was aware that the defendant had sexual relationships with other women.

-11-

The victim did not remember receiving a text message from the defendant where he mentioned the age difference between the two. However, she did recall the text message the defendant sent her referencing cocoa butter, and she told D.D. that the text message referred to the defendant's daughter and the fact that the defendant rubbed her with cocoa butter to help heal her scars.

In her initial statement, the victim wrote that the defendant told her that "something bad would happen" to her if she told anyone that the defendant was touching her. At trial, she testified that the defendant never directly threatened her with harm if she told her mother, but because he threatened her brother, she believed that the defendant would harm her brother if she told anyone about their relationship. She stated that she remembered two weeks prior to trial that the defendant did not threaten her.

The victim testified that the defendant also never used violence to force her to have sexual intercourse with him but covered her mouth when she "was making sex noises" to prevent anyone from hearing them. She initially told police that the defendant placed his hand over her mouth to prevent her from screaming for her mother, but she admitted that this statement was inaccurate and that the defendant only placed his hand over her mouth one time to keep her from making "sex sounds."

However, she did recall the instances where the defendant had thrown her mother into a wall and thrown her down the stairs. She noted that the defendant and her mother often fought about the relationship between the victim and the defendant and that the defendant always took the victim's side in the disputes. After seeing the violent side of the defendant, the victim became even more afraid that the defendant would harm her brother if she revealed their relationship.

After the victim was caught having sex with her boyfriend, her mother came to her and asked why the victim was so sexually active. Eventually, the victim started crying and revealed to her mother the nature of her relationship with the defendant. She testified that she told her mother about her relationship with the defendant at this time not to get out of trouble for having sex with her boyfriend but because she finally felt safe enough after the order of protection to believe that the defendant could not come back and harm her family.

The victim stated that she enjoyed all of the instances of sexual activity with the defendant and viewed him as a boyfriend. When she spoke to a detective, she came "to [her] senses that [the defendant] was not my boyfriend and that he was my mother's boyfriend," and she told the detective that she was raped because she "was 13 and he was 30."

-12-

Erin O'Connor, a friend of the family, testified that she first got a job with DT's Used Appliances in the early summer of 2009 and lived with the victim and her family on and off for nine months. The first time she saw the defendant was in the fall of 2009 when she was working at the store with the victim. The victim received a phone call from the defendant and then told Ms. O'Connor that she was going to the library. After about fifteen or twenty minutes, Ms. O'Connor went out the back door of the store "to go see if anything was going on back there." She witnessed the victim and the defendant in a maroon car, and she approached the vehicle because she knew that the victim had a bicycle and was supposed to be at the library. She thought that it seemed odd that she was instead sitting in the car with a stranger. Because Ms. O'Connor was in charge of the store that day, she felt like it was her responsibility to ask questions when she saw a minor sitting in the car with an adult whom Ms. O'Connor did not know. After the victim assured her that everything was fine and that she was with her "step-dad," Ms. O'Connor returned to the store.

Ms. O'Connor began to stay with the family more frequently and eventually moved in full-time with the family into the Sarver Avenue residence in January of 2010. The defendant was incarcerated when Ms. O'Connor first moved in with the family, and she did not frequently interact with the defendant one-on-one when he moved back in. However, it was her understanding that the defendant and D.D. were in a relationship. She noted that the defendant and victim frequently spent time alone together, and whenever the victim's younger sister or his biological daughter asked to come along, the defendant had "excuse after excuse after excuse" for why the girls could not accompany them. She remembered that the defendant occasionally swore at the younger children whenever he was frustrated or they continued to ask him the same question.

Ms. O'Connor recalled one incident where the victim did not wish to accompany the defendant and repeatedly said no to his requests to leave. Ms. O'Connor noted that the defendant seemed to get frustrated and "almost possessive" of the victim after she said no and that he seemed to be ordering, rather than requesting, that she accompany him. She stated that was the only incident she could recall where the defendant acted in a possessive manner toward the victim.

Detective Jill Weaver testified that she worked in the sex crimes unit when the victim made her complaint against the defendant. As part of her job, she followed up with the victims named in reports by the initial patrol officer and interview any other witnesses and gather evidence for the case. She interviewed the victim on July 23, 2010, and she estimated that they spoke for about forty-five minutes. In the interview, the victim described the sexual abuse she received and identified the defendant as the perpetrator. The victim described the defendant as her stepfather, and she described multiple incidents that occurred between them that included oral sex, penile/vaginal penetration, and digital penetration. The victim also

described the time frames in which some of these incidents occurred. Detective Weaver recalled that the victim initially indicated that she was forced and threatened into a sexual relationship with the defendant but later indicated that the defendant did not use force or threats. Detective Weaver did not note this change in her report.

At the time of her report, Detective Weaver felt that her potential investigative options were limited because it had been several months since the defendant had last resided in the home with the victim. Detective Weaver arranged a controlled phone call, which is a phone call where the victim or a concerned party contacts the defendant with the police listening in an attempt to elicit an admission from the defendant. However, the defendant became immediately suspicious when a controlled call was attempted and did not make any admissions about his behavior with the victim. Similar attempts to contact the defendant via text message also failed to yield an admission. Detective Weaver also stated that investigators did not attempt to obtain any DNA evidence because too much time had elapsed from the last sexual contact between the victim and the defendant and the filing of the report.

Detective Weaver spoke with D.D. about her relationship with the defendant. D.D. described the relationship as initially pleasant, but as the relationship progressed, it became an on and off relationship. Toward the end of the relationship, things had become violent between D.D. and the defendant, and D.D. had suspicions that something was wrong with the victim but could not get any information from either the victim or the defendant. Detective Weaver asked D.D. about her sexual relationship with the defendant, and D.D. informed her that they did not use condoms. However, in her report Detective Weaver noted that the defendant and D.D. did use condoms, a mistake she classified as a "typo." Detective Weaver later discovered that the defendant was HIV positive. When she told D.D. that the defendant was HIV positive, D.D. appeared surprised, upset, and the "color kind of sunk out of her face." Detective Weaver stated that the victim never mentioned anything about whether she knew the defendant was HIV positive.

Detective Weaver spoke to the defendant when he was arrested in November of 2010. After the defendant was advised of his *Miranda* rights, he agreed to speak with the detective. During the interview, the defendant never made any admissions of sexual contact with the victim. The defendant described himself several times in the interview as a "daddy" or a "stepfather" to the victim. The defendant posited that there would be numerous witnesses to contradict the victim's version of events but never offered any names for Detective Weaver to follow up. The defendant also offered numerous theories as to why these allegations were made against him. He initially blamed D.D.'s son for setting these events in motion; he then suggested that because D.D. provided financial support for numerous individuals that they would say whatever she paid them to say. He frequently stated that the charges were brought against him because D.D. was angry that he left her home and was

attempting to punish him for leaving. He stated that he always cleaned up the house and assisted with chores and suggested that D.D. made the allegations of rape because she was upset that the defendant would no longer be there to help around the house. He next contended that the victim made the allegations in an attempt to cover up her own promiscuity and claimed that the victim was confusing him with other individuals with whom she was involved. He also called himself the "weed connection" for the house and suspected that he was accused because he no longer supplied marijuana. He next theorized that a dispute over a used truck led to the charges. He lastly claimed that the allegations were inspired by racism. He admitted during the interview that he was HIV positive and believed he may have contracted the virus through a blood transfusion. Detective Weaver did not discover any evidence to corroborate any of the defendant's theories as to the reasons for the allegations.

During the interview, Detective Weaver asked the defendant about the terms "Becky," "chicken," and "FSM." The defendant stated that "Becky" was the name of a song that he was familiar with but said that he never had "Becky" with the victim. He stated that he used the term "chicken" to refer to "little yellow children," including his biological daughter. He denied ever using the term with the victim. He also denied using the acronym "FSM" with the victim, even after Detective Weaver told him that it stood for "future son's mother."

Detective Weaver was not able to see any of the text messages or cell phone records of conversations between the victim and the defendant. The victim no longer had the texts stored on her phone, and the detective did not contact the cell phone provider to inquire into the existence of a backlog or backup database because the victim's cell phone provider did not have such a database. She did examine the victim's school records to see if her absences corresponded to her account but did not review the records with the victim. None of the witnesses interviewed by Detective Weaver observed the victim engage in sexual activity.

At the conclusion of the trial, the jury found the defendant guilty of Count 1 and Counts 3 through 11. The jury could not reach a decision on Counts 2 and 12, and the trial court declared a mistrial as to both counts.

At the sentencing hearing, both the victim and the defendant testified. The defendant testified that he believed that he should receive a lesser sentence because his conviction was predicated on false testimony from the victim and her mother. He stated that he never touched the victim or her mother and felt that they were angry at him because "I ain't [sic] there to do their chores no more and be their do boy, and that's what I'm going to the penitentiary for." He testified that "Becky" was his brother's wife and that "FSM" meant "[f]orever staying motivated." He stated that just prior to his arrest, he had been smoking high-grade marijuana, and as a result of the potency of the marijuana, he was unable to

remember what he told the detective that "FSM" meant. He told the trial court that he smoked marijuana because he was HIV positive and needed the marijuana to help him develop an appetite and also stated that he smoked marijuana because he suffered from "stress, post-traumatic syndrome."

The trial court applied enhancement factor one, that the defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish him as a Range II offender. The trial court also applied enhancement factor seven because the evidence fully bore out that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement and applied enhancement factor fourteen because the defendant abused a position of private trust. The trial court found that enhancement factor twenty-one applied because the defendant was HIV positive and exposed the victim to the illness. The trial court did not find that any mitigating factors applied, even though the defendant asked the court to consider the "unusual circumstances" surrounding the offenses. Based on the enhancement factors it found applicable, the trial court sentenced the defendant to serve twenty years at 100% for each of the rape convictions and sentenced him to serve ten years at 35% for the criminal exposure to HIV.

The trial court found that none of the mandatory factors requiring consecutive sentencing applied but found that because the defendant was convicted of two or more statutory offenses involving sexual abuse of a minor, consecutive sentencing was appropriate. The trial court found that the defendant was a father figure to the victim who was "able to manipulate fully her emotions." The court found that the sexual activity "went on for a regular and consistent period of time" and that the abuse had a "resulting mental/emotional impact" on the victim. The trial court also found that "one of the key factors" in terms of the offense being aggravated was the fact that the defendant was HIV positive and knew that he was HIV positive and that there was very little evidence to indicate that the defendant was utilizing protective measures to prevent exposing the victim to the virus. The court ordered the sentences in Counts 1, 3, 4, 5, and 6 to be served concurrently with each other. The sentences in Counts 7, 8, 9, and 10 were ordered to be served concurrently with each other but consecutively to Counts 1, 3, 4, 5, and 6. The court also ordered the sentence for count 11 to be served consecutively to Counts 1 through 10 for an effective sentence of fifty years. However, several of the judgments contain clerical errors, as the judgment for Count 6 states that the sentence is to be served concurrently with the sentence for Count 2, a count as to which the trial court declared a mistrial, and the judgment for Count 8 states that the sentence is to be served concurrently with, rather than consecutively to, the sentence in Count 11.

At the motion for a new trial, the defendant objected to various parts of the State's closing argument. Although there was only one contemporaneous objection at trial, in his motion the defendant argued that there were multiple instances of prosecutorial misconduct

where the State used closing argument to inflame the passions and prejudices of the jury, to inject issues broader than the guilt or innocence of the accused, and to make predictions of the consequences of the jury's verdict. The trial court found that the arguments made in closing arguments were not improper because they were made in response to the defense's challenge to the victim's credibility, and while the arguments may have initially started referencing societal obligations to minors in a broad sense, they were quickly narrowed to relate specifically to the victim. In regards to the jury having a relationship of trust with the victim, the trial court found the remarks were not improper because the State used the argument to illustrate a reasonable expectation of a relationship with a child and to contrast it with the defendant's usage of the relationship to perpetrate sexual abuse against the victim. The trial court noted that the arguments "regularly zeroed back in on the facts of the case" and that the State argued within the evidence presented to emphasize that the defendant used his parental position to sexually abuse the victim. The trial court did not find that the arguments were used to imply to the jury that they would be failing society if they did not return a verdict of guilty but rather the arguments were "appropriate in the context of the evidence presented in this case."

In his motion for a new trial, the defendant also argued that the trial court erred in failing to dismiss elected counts of the offense that, based on the victim's testimony, occurred outside of the dates charged on the original indictments. After reviewing the testimony, the trial court found that Counts 1 and 2 of the indictment occurred in January of 2009, outside the dates alleged in the indictment, and ordered Counts 1 and 2 dismissed. The trial court denied all other issues raised in the motion for a new trial.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to sustain his convictions for rape and criminal exposure to HIV. Specifically, he contends that the evidence was insufficient to support a finding that a sexual relationship existed between the victim and the defendant or that the defendant used coercion to commit rape.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn.

2003). Therefore, this court will not re-weigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Tennessee Code Annotated section 39-13-503 defines rape as the "unlawful sexual penetration of a victim by the defendant or of a defendant by a victim accompanied by . . . force or coercion." T.C.A. § 39-13-503(a)(1) (2012). Coercion is defined as the "use of parental, custodial, or official authority over a child less than fifteen (15) years of age. T.C.A. § 39-13-501(1). Tennessee Code Annotated section 39-13-109 states that a person commits the offense of criminal exposure of another to human immunodeficiency virus ("HIV") when, knowing that the person is infected with HIV, the person knowingly engages in intimate contact with another. T.C.A. § 39-13-109(a)(1). Intimate contact with another means the exposure of the body of one person to a bodily fluid of another person in any manner that presents a significant risk of HIV transmission. *Id.* at (b)(2).

The defendant argues that there is insufficient evidence to support the existence of a sexual relationship between the defendant and the victim because the only proof presented at trial was the testimony of the victim, which contained various inconsistencies. However, our supreme court has stated that "it has long been the rule in our state that the uncorroborated testimony of a minor victim may be sufficient to sustain a conviction for forcible or coercive sex offenses such as simple rape." *State v. Collier*, 411 S.W.3d 886, 899 (Tenn. 2012); *see also State v. McKnight*, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994) (holding that corroboration of minor victims' testimony not necessary to support a conviction for rape), *abrogated on other grounds by State v. Williams*, 977 S.W.2d 101 (Tenn. 1998); *Montgomery v. State*, 556 S.W.2d 559, 560 (Tenn. Crim. App. 1977) (stating that rape statute does not require that testimony of minor female victim be corroborated to support a conviction of rape).

The defendant contends that the testimony of the victim is "problematic" and filled with inconsistencies that prevented a reasonable trier of fact from finding beyond a reasonable doubt that a sexual relationship existed. At trial, the victim testified to five specific instances where the defendant either performed oral sex on her or had sexual intercourse with her. While there were some inconsistencies between the victim's pre-trial

-18-

statements and her testimony, such as specific dates when and locations where the sexual abuse occurred, these inconsistencies alone do not make the testimony so unreliable that a conviction may not stand. Throughout her testimony, the victim maintained that the defendant was her abuser. A thorough cross-examination made the jury aware of the inconsistencies regarding the dates of abuse and the types of sexual encounters that occurred, and the victim's written statement was introduced as evidence for the jury to consider.

After weighing the evidence, the jury returned a verdict of guilty as to nine of the ten counts of rape. A guilty verdict credits the testimony of the State's witnesses "and resolves all conflicts in favor of the prosecution's theory." *Bland*, 958 S.W.2d at 659. Further, "a jury's verdict will not be overturned unless there are inaccuracies or inconsistencies 'that are so improbable or unsatisfactory as to create a reasonable doubt of the [defendant's] guilt.'" *Elkins*, 102 S.W.3d at 582-83 (quoting *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)). Here, the inconsistencies in the victim's testimony were not so "improbable or unsatisfactory" to raise a reasonable doubt as to the defendant's guilt on the charge of rape. Viewing the evidence in the light most favorable to the State, we conclude that there was ample evidence to permit a rational trier of fact to find the defendant guilty of the charge of rape.

The defendant also argues that there is insufficient evidence to indicate that he was in a parental or custodial relationship with the victim or that he used this relationship to accomplish the rape of the victim. We disagree. The defendant claims he was vested with only "limited and finite" authority that was "clearly secondary to the household control that D.D. exerted." However, the victim testified that she had viewed the defendant as her stepfather since living with him in Kentucky because he was the male figure in her life who took her to school, assisted her with homework, prepared meals for her, and took her on outings. D.D. worked six days a week, leaving the defendant as the primary caretaker for her children. D.D. testified that the defendant was like her co-parent and assisted her in disciplining her children. Further, the defendant, in his recorded statement, frequently stated that he was like a "daddy" and like a "stepfather" to the victim. Even after the defendant left the apartment, he continued to contact D.D. and asked to spend time with the victim and her sister because "he loved the kids and he wanted to spend time with them." The jury heard this testimony and found that the defendant was in a parental or custodial relationship with the victim. Viewing the evidence in the light most favorable to the State, we conclude that the record supports a finding that the defendant was in a parental or custodial relationship with the victim at the time of the offenses.

The defendant next argues that there is no evidence to support a finding that he used his custodial relationship to facilitate sexual encounters with the victim. He argues that in 2009, his relationship with the victim changed from that of a "quasi-parent or supervisory

into a mutual friendship." He contends that all of the acts alleged in counts 3 through 8 occurred during this period of mutual friendship and that any custodial or parental role he once had was nullified. The defendant also claims that his convictions on counts nine and ten should be dismissed because the acts occurred at the Sarver Avenue house when he was "no longer in the same position of quasi-parental authority as he had been previously," and the sexual acts "were thus outside the scope of any parental or custodial relationship."

Once again, the record does not support this assertion. As the trial court noted at the sentencing hearing, there was no question that the defendant "had become kind of the father of this family, primarily a stay-at-home father, and used his position of trust in order to kind of put that wedge between [the victim] and her mother." While the victim testified that at the time the abuse was occurring she viewed the defendant as a boyfriend and enjoyed the sexual activity, she developed this view only because the defendant had been spending time with her as a father figure. As the trial court observed, while the victim was "mature, she was still a minor and [the defendant] was able to manipulate fully her emotions." There is no merit to the defendant's claim that he did not use his custodial relationship to facilitate the sexual activity. The defendant was a father figure to the victim and exploited this relationship to begin a sexual relationship with the victim. As his own letters demonstrate, the defendant viewed himself as a father figure to the victim, as he wrote that the victim "must really love daddy." In his letters, he dispensed fatherly advice, exhorting the victim to do well in school, to respect her mother, and protect her younger sister, and then several paragraphs later, he used coded words to refer to oral sex and the victim's vagina. Based on these letters and the testimony at trial, a rational trier of fact could have found that a custodial relationship existed and was used to effectuate a sexual relationship. As to his claims regarding counts nine and ten, both the victim and her mother testified that the defendant moved into the Sarver Avenue house in November and that the defendant stayed there several nights a week until his arrest in December. During that two-month period, the defendant was working on repairing his relationship with D.D. Further, the acts alleged in counts nine and ten occurred in December, well after the defendant had returned to the Sarver Avenue house. This issue is without merit, and the defendant is entitled to no relief.

Because we concluded that the evidence was sufficient to support the defendant's convictions for rape by coercion, the evidence is also sufficient to support the defendant's conviction for criminal exposure to HIV. The evidence showed that the defendant tested positive for HIV, and he admitted that he was HIV positive in his interview with Detective Weaver and at his sentencing hearing. Viewing the evidence in the light most favorable to the State, the evidence shows that the defendant was infected with HIV and knowingly engaged in intimate contact with the victim. This issue is also without merit, and the defendant is not entitled to any relief.

-20-

## II. Consent as a Defense

The defendant next argues that the trial court erred by preventing him from raising the consent of a victim as a defense to the charge of rape. Specifically, he contends that because the only difference between the crime of statutory rape by an authority figure and rape by coercion is the element of consent that he should have been permitted to raise this defense at trial and that the inability to do so deprived him of his constitutional right to present a defense. The State responds that the plain language of the statute indicates that consent cannot be a defense when the charge is rape accomplished by coercion because coercion commonly means that someone performed an act but did so unwillingly or involuntarily.

Rape is defined as the unlawful sexual penetration of the victim accompanied by any of the following circumstances: force or coercion is used to accomplish the act. T.C.A. § 39-13-503(a)(1). Coercion is defined as the threat of kidnapping, extortion, force, or violence to be performed immediately or in the future *or the use of parental, custodial, or official authority over a child less than fifteen (15) years of age. Id.* at § 39-13-501(1) (emphasis added). The definition of coercion contains two different facets: it is either the threat of kidnapping, extortion, force, or violence to be performed immediately or in the future, or it is the use of parental, custodial, or official authority over a child less than fifteen years of age. Thus, the crime of rape by coercion in this case is the unlawful sexual penetration of the victim accompanied by the use of parental, custodial, or official authority over a child less than fifteen years of age.

Courts frequently have held that in the state of Tennessee, minors are incapable of consenting to the crime of rape of a child or the crime of statutory rape. *See Collier*, 411 S.W.3d at 899 ("As a matter of law, a minor is indeed incapable of consenting to a statutory rape."); *State v. Ballinger*, 93 S.W.3d 881, 881 (Tenn. Crim. App. 2001) ("[c]onsent is no defense to statutory rape."); *State v. Jones*, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994) ("[c]onsent is never a defense to a sex offense when the victim is less than thirteen years of age."). Similarly to the crime of rape by coercion, the crimes of rape of a child and statutory rape all impose an age limitation on the victim. *See* T.C.A. § 39-13-501(1) (defining coercion as "the use of parental, custodial, or official authority over a child less than fifteen (15) years of age"); T.C.A. § 39-13-522(a) (victim of rape of a child is more than three but less than thirteen years of age); T.C.A. § 39-13-506(b)(1),(2) (victim of statutory rape at least thirteen but less than eighteen years of age); *Collier*, 411 S.W.3d at 899. The legislature specifically included the age restriction of "less than fifteen years" for the crime of rape by coercion. This age restriction is indicative of an intent to create a specific offense when the victim is less than fifteen years old, much like rape of a child and statutory rape are age-specific offenses. Because a minor victim may not consent to the crimes of rape of a child or statutory rape, it follows that a minor victim also may not consent to rape by coercion. *See*

-21-

*Collier*, 411 S.W.3d at 899. We see no reason to conclude that a fourteen-year old who would be incapable of consenting to a statutory rape would somehow be capable of consenting to a rape by coercion. Such a conclusion is contradictory to the special protections that the legislature and supreme court have carved out for sexual offenses committed against minors. Therefore, it was not error for the trial court to exclude the defense of consent, and the defendant is not entitled to any relief on this claim.

### III. Prosecutorial Misconduct

The defendant argues that the trial court erred when it failed to find that the State committed prosecutorial misconduct based upon inappropriate comments made during closing argument. Specifically, he contends that the State misstated the evidence, used arguments calculated to inflame the passions or prejudices of the jury, injected issues broader than the defendant's guilt or innocence, and made predictions as to the consequences of the jury's verdict.

Closing argument is a valuable tool for both parties during trial, and wide latitude is given to counsel in presenting these arguments to the jury. *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). Consequently, a trial court is accorded wide discretion in its control of closing arguments. *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). This court will not interfere with that discretion unless there is evidence it was abused. *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). However, closing arguments "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *Goltz*, 111 S.W.3d at 5. In order to determine if closing remarks were improper, this court generally recognizes five areas of prosecutorial misconduct:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence of guilt of the defendant.
> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions of the consequences of the jury's verdict.
> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Goltz*, 111 S.W. 3d at 6.

In order to measure the prejudicial impact of any misconduct, this court should consider: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Zirkle*, 874 S.W.2d at 888. To show error, a defendant must demonstrate that the argument was so inflammatory or the conduct so improper that it affected the verdict to the defendant's detriment. *Id.*

The defendant first contends that the prosecutor intentionally misstated evidence in closing arguments. Specifically, he objects to the prosecution's statement to the jury that the victim's "first sexual experience was this man putting his head between her legs," and he objected contemporaneously at trial. The trial court overruled the objection and stated it would instruct the jury that "if attorneys said something that's not in the evidence, disregard that." The defendant argues that the evidence never indicated that the victim's first sexual experience occurred with the defendant and that the prosecutor used these words to elicit an emotional response from the jury. The State contends that there was no other testimony about sexual encounters prior to those with the defendant and that the prosecutor may have assumed the victim's first sexual encounter was with the defendant. The defendant offered to make an offer of proof of the victim's first sexual encounters after closing arguments, but he never made such an offer.

Considering this statement in light of the *Goltz* factors, we conclude that it does not amount to prosecutorial misconduct. There is no evidence that the prosecutor made an intentional misstatement of the evidence. The trial court also issued a curative instruction to the jury to disregard any statements made by the attorneys that were not in the evidence. Defense counsel stated that he would make an offer of proof indicating that the victim's first sexual encounter did not occur with the defendant, but he made no such offer. The evidence of guilt against the defendant was substantial in this case, and the statement was a small part of a lengthy closing argument.

The State contends that the remaining claims of prosecutorial misconduct are waived because the defense failed to make a contemporaneous objection at trial. The defendant acknowledges that no objection was made at trial but contends that he has sufficiently preserved the issue on appeal by raising the issue of prosecutorial misconduct in his motion for a new trial. Generally, an issue raised for the first time on appeal is waived. *See* Tenn. R. App. P. 36(a). However, because the defendant did address and develop an argument as to the specific instances of prosecutorial misconduct at the motion for a new trial, we will review the defendant's remaining claims of prosecutorial misconduct. *See* Tenn. R. App. P.

3(e).

The defendant finds fault with the prosecutor categorizing the defendant as a "specter" over the victim's future relationships and the argument that the defendant's actions left her in the "winter of her discontent." The prosecutor also suggested that a guilty verdict would tell the victim that "you believe her that when she was suffering in silence, she wasn't suffering alone," and that "joy cometh in the morning, that there is dawn, that there is something that will make the specters recede into the darkness." He contends that these statements muddled the evidence and law the jury was to consider by playing upon the "passions and prejudices surrounding the societal perception of child sex acts."

We conclude that none of the prosecution's statements were so inflammatory that it affected the verdict to the detriment of the defendant. *See Zirkle*, 910 S.W.2d at 888. In closing argument, the prosecutor "should refrain from engaging in any sort of personal name-calling." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). While the use of the term "specter" may constitute improper name-calling, its usage did not affect the verdict in a manner that adversely affected the defendant.

The defendant next claims that the prosecutor's statements to the jury were intended to inflame the passions of the jury and "injected issues broader than the guilt or innocence of the [defendant] and made predictions of the consequences of the jury's verdict." He takes issue with the following statement:

> As parents, we swear to protect our children, and stepchildren are the children we choose and we treat them with the love and kindness and affection as we would any other child. Ladies and gentlemen, today, right now, you are in that relationship with [the victim,] that relationship of protection, and you can't give her back what she's lost. You can't undo the perversions that have been done to her, but you can give her something that she'll carry with her this day and all days, that you believe her that when she was suffering in silence, she wasn't suffering alone, and you can tell her that there is justice and that though the man sworn to love and protect her will victimize her in the night, that joy cometh in the morning, that there is dawn, that there is something that will make the specters recede into the darkness. Don't give her justice because you feel bad for her. Don't give her justice because you hate what [the defendant] did to her. Give her justice because it is right. And tell her, despite whatever attacks are coming her way, that you believe her.

We conclude that this argument was not improper or intended to shift the focus from the guilt or innocence of the defendant. As the trial court noted, the victim's credibility was "a huge issue in this case." Examining the prosecutor's comments in light of the evidence presented at trial, this argument was made to preempt the defense's expected challenge of the victim's credibility and to encourage the jury to convict the defendant only if they believed the victim's testimony. The defendant has failed to prove that these statements were improper and is not entitled to relief on this claim.

Lastly, the defendant takes issue with portions of the State's rebuttal argument where the prosecutor stated that the defendant was responsible for taking most of the victim's teenage years away from her. He argues that these statements place emphasis on rehabilitating the victim, rather than the determination of guilt or innocence of the defendant. We disagree. This case involved the defendant using his parental and custodial authority to perpetrate the rape of the victim, who was fourteen years old at the time of the incidents. The arguments were relevant to the evidence presented at trial that the defendant used his position of power and trust to abuse the victim. Further, we conclude that the defendant has not proven that the arguments were so inflammatory that they affected the verdict to the defendant's detriment. The defendant is not entitled to any relief on this issue.

## IV. Sentencing

The defendant argues that the trial court erred in enhancing his sentences for his rape convictions to twenty years, for enhancing his sentence for criminal exposure to HIV to ten years, and for ordering him to serve the sentences consecutively. Specifically, he contends that the trial court erred when it failed to find a mitigating factor applied and that the admittedly consensual relationship between the defendant and the victim suggests that an effective sentence of fifty years was not related to the severity of the offense or necessary to protect society from further harm. We disagree.

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. In that situation, this court may not modify a sentence "even if we would have preferred a different result." *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The defendant bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The misapplication of an enhancement or mitigating factor by the trial court "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act,

as amended in 2005." *Bise*, 380 S.W.3d at 707. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing as provided by statute." *Id.*

A trial court has the ability to impose consecutive sentences if it finds by a preponderance of the evidence that the defendant falls into one of seven categories, including that "the defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims." T.C.A. § 40-35-115(b)(5). A trial court's decision to impose consecutive sentencing is also reviewed under an abuse of discretion standard with a presumption of reasonableness. *State v. Pollard*, —S.W.3d— , 2013 WL 6732667, at * 7 (Tenn. 2013). So long as the "trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable, and absent an abuse of discretion, upheld on appeal." *Id.* at *9.

At sentencing, the trial court considered the evidence presented at trial, the pre-sentence report, the sentencing principles in T.C.A. § 40-35-103, the arguments at sentencing, the nature and characteristics of the criminal conduct involved, the evidence and information offered on enhancement and mitigating factors, statements made by the defendant on his own behalf, the defendant's potential for rehabilitation, as well as the general purposes of the Sentencing Act. The trial court found that several enhancement factors applied. The court found that enhancement factor one (previous history of criminal convictions), enhancement factor number seven (that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement), enhancement factor number fourteen (abuse of a position of private trust), and enhancement factor number twenty one (that the defendant had HIV and exposed the victim to it) applied. The trial court declined to apply mitigating factor number five (the defendant's conduct caused or threatened serious bodily injury), and the defendant argues that the failure to do so constitutes error. However, the trial court noted that "one of the most significant things" was that the defendant knew that he was HIV positive and that there was very little evidence to indicate that he utilized protective measures to prevent exposing the victim to HIV.

The trial court implicitly rejected mitigating factor number five because having unprotected sexual intercourse with an individual with HIV threatened the victim with serious bodily injury. We note that enhancement factor fourteen is essentially an element of the offense, as abuse of a position of private trust is inherent in the crime of rape by the use of parental or custodial authority. Therefore, the trial court should not have considered enhancement factor fourteen. *See* T.C.A. § 40-35-114 (stating that court shall not consider

advisory factor that is an essential element of the offense). However, "a trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its decision." *Bise*, 380 S.W.3d at 709. The record demonstrates that the trial court imposed the sentence in compliance with the purposes, principles, and goals of the Sentencing Act. The sentence was within the appropriate range, and the trial court properly found that other enhancement factors applied. Therefore, we conclude that the trial court did not abuse its discretion in sentencing the defendant.

The trial court found that none of the mandatory factors requiring consecutive sentencing were present but chose to apply consecutive sentences because the defendant was convicted of two or more statutory offenses involving sexual abuse of a minor. The trial court also considered a variety of aggravating factors in applying consecutive sentencing. The trial court found that the offense arose from a relationship between the victim and the defendant and that the defendant was a father figure to the victim who "intentionally went about trying to isolate her from the rest of the family." The court found that he "fully manipulated her emotions" and that the abuse continued undetected for a significant length of time. The trial court also found that there was a wide variety of sexual acts performed and that the abuse had a significant impact on the victim. The court found that the defendant took advantage of his relationship with the victim, and "one of the key factors in terms of [the offenses] being aggravated" was the defendant's knowledge that he had HIV and his subsequent exposure of the victim to HIV. The trial court found by a preponderance of the evidence that a factor applied to justify consecutive sentencing and articulated on the record the reasons for imposing consecutive sentencing. We find no basis to conclude that the trial court abused its discretion in imposing consecutive sentences. The defendant is entitled to no relief.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed, but we remand to the trial court for the limited purpose of entry of corrected judgments that reflect the dismissal of Count 1 and to correct clerical errors in the judgments for Counts 6 and 8.

_____
JOHN EVERETT WILLIAMS, JUDGE